IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **CRIMINAL ACTION** |
| | : | No. 21-144-1 |
| v. | : | |
| | : | |
| **JOHN ADAMS** | : | |
| | : | |
| | : | |

**McHUGH, J.**                                                                                           **October 28, 2022**

## MEMORANDUM

Defendant John Adams stands charged with sex trafficking of minors in violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1591 *et seq.*, and obstruction of justice. At some point during the investigation, Mr. Adams learned his activities had come to the attention of law enforcement and decided it would be in his interest to present himself and show he had "nothing to hide." After an initial meeting with local police, he later appeared at an FBI field office. There, having tried and failed to outwit the agents, he ultimately consented to a search of his phone. That search revealed that he had selectively deleted incriminating texts. He now moves to suppress the results of that search on a variety of grounds. Because I am persuaded that his consent to the search was not tainted by any unlawful conduct by the agents, the motion will be denied.

**I.     Relevant Background**

The following facts are alleged in a light most favorable to the defendant.[1] On January 31, 2020, Sergeant Simpkins of the Tinicum Township Police Department stopped a vehicle suspected

---

[1] Because there are no "concrete issues of fact material to the resolution of the defendant's constitutional claim," an evidentiary hearing is not required. *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010) (citing *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996)); *see* Fed. R. Crim. Pro. 12(c)(1) ("The court . . . *may* also schedule a motion hearing.") (emphasis added).

to be transporting J.A., believed to be a victim of sex trafficking. Incident Report Form, Def.'s Attach. A, ECF 95-1, at 4-5. In the backseat of the vehicle, Sergeant Simpkins found J.A. and S.H., who said they were 15 and 16 years old respectively. *Id.* at 5. Police transported the driver – a man named Chukuw Ossai – and both girls back to headquarters. *Id.*

At headquarters, J.A. spoke with FBI Special Agents Coughlin and Dozier. *Id.* Special Agent Coughlin's affidavit of probable cause,[2] the contents of which are not disputed, sets forth details of that conversation. Coughlin Aff., May 19, 2020, ECF 104-1. J.A. told agents that she ran away from a foster care group home and was introduced to Mr. John Adams. *Id.* at ¶ 9. She soon began living with Mr. Adams at his house on Mentor Street, and explained that she had sex with him so she could continue staying there. *Id.* J.A. stated that she had sex with other men in exchange for money at Mr. Adam's direction at two of his properties and at the Microtel hotel, and that Mr. Adams would keep a portion of the profits. *Id.* at ¶¶ 9-10, 24. J.A. also consented to a search of her cell phone, and the records revealed several incriminating messages corroborating her account. *Id.* at ¶¶ 9, 18-23. Agents found texts between J.A. and Mr. Adams documenting their plans for J.A. to engage in sex work and some that even described a contemporaneous sex act for money.

January 13, 2020

        Adams: Get naked stop acting shy yo
        Adams: U full of shit
        Adams: Got pocket full of money I'm put in ur panties
        Adams: Stop playing
        Adams: Lol
        Adams: Girl no one going know but us

---

[2] The Government submitted two affidavits of probable cause with its filing – one dated February 18, 2020, seeking a search warrant for Mr. Adams' Gmail account, ECF 104, and one dated May 19, 2020, seeking a search warrant for Sprint accounts associated with Mr. Adams' cell phone as well as two others' cell phones, ECF 104-1. Both contain information about the agents' interview with J.A. and the text messages they recovered from her cell phone.

| | |
|---|---|
| Adams: | We not going tell no one |
| \*\*\* | |
| Adams: | I dont need the headache band weird shit. Like we a team. U will make money. If me or kai wanna fuck we fuck like it's simple and u will make good money and be safe with us. Like it's up to u u know what I want so u either down or I'm cool |
| Adams: | Stop the bs and make money |
| J.A.: | Not only do I wanna make money but [S.H.] too, but ok I'm down |
| J.A.: | So that mean we can move in, I'm not about to keep traveling back and forth |
| \*\*\* | |
| J.A.: | [S.H.] wanna bust her trap with you too |
| Adams: | Huh |
| Adams: | What u mean |
| J.A.: | She want to have sex for money is what I'm saying |

January 15, 2020

| | |
|---|---|
| Adams: | Dick suck on way hurry up |
| J.A.: | Ok |
| Adams: | Over 15 min |
| J.A.: | Coming now |
| J.A.: | Definitely needa change sheets [emojis] |
| Adams: | Lol |
| Adams: | U cum on them |
| J.A.: | Fuck no he did |
| J.A.: | off a hand job |
| J.A.: | I aint even have to suck it |
| Adams: | Lock screen |
| Adams: | Time up |
| J.A.: | Me and [S.H.] made some good money tho |
| Adams: | Ya mean nothing if we locked up |

SMS Messages, ECF 104-2, at 4-5, 8-10. Finally, while J.A. and S.H. were still at the station, both individually contacted Mr. Adams to tell him where they were and that the police had showed them his photograph. Interview Tr. of John Adams, ECF 108, at 67.[3]

---

[3] The Government provided both an audio recording and a transcript memorializing Mr. Adams' interview with the FBI. I have listened to portions of the tape and reviewed the interview transcript at length, the accuracy of which is not disputed.

3

The following day, Mr. Adams went to Tinicum Township police headquarters to discuss the case. Incident Report Form 5. He signed a written statement explaining that he met J.A. and S.H. two weeks prior because "they were on [the] street," and that they stayed at his house for two nights. Voluntary Statement, Def.'s Attach. B, ECF 95-2. He explicitly denied having sex with J.A. but noted that "at some point [he] found out [J.A. and S.H.] were tricking." *Id.* He elaborated that "someone said I posted them for sex," but claimed that he didn't know what posting meant until that very day. *Id.*

Four days later, on February 6, Mr. Adams made a second unsolicited trip to speak with law enforcement – this time going to the FBI field office in Philadelphia. His recorded conversation with Special Agents Dozier and Coughlin lasted about three hours, and he was at the office for about four hours. Mr. Adams told agents from the outset that he knew he was under investigation but that he didn't want officers to come to his home and that he had "nothing to hide." Interview Tr. 4-5. He explained that his attorney knew he was speaking with the FBI and he provided his attorney's contact information. *Id.* at 4. He then discussed his work schedule as a driver for Amazon and for Uber, showing the agents copies of his timecards for the last few months. *Id.* at 5-12. In the context of his busy work schedule, Mr. Adams stated, "I'm not running a criminal operation [for] sex trafficking." *Id.* at 12.

Mr. Adams then shifted the conversation to "get into the story," beginning to discuss how he met J.A. and S.H. *Id.* He averred that a woman named Bri, who was temporarily living in a property Mr. Adams managed on North Cleveland Street ("Cleveland house"), had a friend named J.A. who needed a place to stay.[4] *Id.* at 12-14, 19, 31. Bri connected Mr. Adams with J.A. and,

---

[4] Mr. Adams described how he often meets women and allows them to stay in the properties he manages while they are unoccupied. He elaborated that, "if she got a problem . . . she'll come to my house or

4

that same night, Mr. Adams drove to pick her up. *Id.* at 31. S.H. was with J.A. when Mr. Adams arrived, so both girls went with him to his home on Mentor Street. *Id.* at 32-33. Mr. Adams represented that J.A. stayed with him for about one and a half days, while S.H. purportedly stayed with him for less than a day. *Id.* at 46-47. According to Mr. Adams, he learned J.A. had people over to his home while he was out at work, so he kicked her out of his house. *Id.* at 47-48.

Approximately two weeks later, Mr. Adams said that he went to the Cleveland house to collect rent money. While there, he learned that J.A. had been staying in the house without his permission. *Id.* at 57. Out of frustration, he kicked everyone out of the Cleveland house. *Id.* at 62. According to Mr. Adams, it was about three days later that Special Victims picked up J.A. and S.H. *Id.* at 64.

Mr. Adams then told the agents that he "never stepped foot in any of the hotels," and that he only picked up J.A. and S.H. from a hotel on one occasion. *Id.* at 69-70. He tried to show agents printed-out pictures of text messages between S.H. and J.A., sent to him by S.H.'s brother, to corroborate that he was not involved in any hotel-based activity. *Id.* at 73-75. In response, Special Agent Coughlin suggested that Mr. Adams consent to a search of his cell phone to clear up any confusion. A relevant excerpt of that conversation follows:

> Coughlin: So if – if – listen. We're gonna – you give us consent to search your phone, I'm gonna dump it right now, and then we can have it back to you as soon as possible to figure all this out.
> Dozier: Yeah. So we won't have to keep it, we're not –
> Adams: That's what he said! He – that's what he said. He says if you guys will call him and he give me permission, I have no problem with that. But he says – he says don't give 'em the phone until I talk to you. That's what he said.
> Dozier: Okay.

---

whatever, and until she do something wrong to me or whatever, if we have a relationship, she can stay there." *Id.* at 22.

| | |
|---|---|
| Coughlin: | Well we – well – we're gonna take, we're gonna seize the phone today. And then we're gonna get a search warrant. And it could take a little time to get your phone back. So what im [sic] saying is, hey listen. You came down here to try to be cooperative. |
| Dozier: | Yeah. |
| Coughlin: | If you give consent to search. |
| Adams: | Can I call – can I call him? |
| Coughlin: | Listen, I'm gonna explain to you what's gonna happen. |
| Adams: | Okay. |
| Coughlin: | We're gonna – if you give us consent to search, we can get this thing started now, and get your phone back to you as soon as possible. |
| Dozier: | Right. |
| Coughlin: | If not, the phone stays with us. |
| Dozier: | Right |
| Coughlin: | We have to write up – type up a search warrant. Go get it to the AUSA to get approval, go in front of a judge to get it sworn out, and then we can search the phone. If you give us consent, I'll – I'll write down the information. Boom, I'll get it to somebody, and away we go. We – this is great evidence. |
| Adams: | Right. |
| Coughlin: | And it's gonna clear your name. But we can't just use one screenshot. |
| Dozier: | Right. |
| Coughlin: | We need to see everything in it. Do you understand that? We can't just go by this. |
| *** | |
| Coughlin: | But that'll – that'll clear your name. Like, hey why didn't you call the cops, all that stuff. |
| Adams: | I have no problem with that. Can I – that's what I'm saying. Can I call Campo's[5] and – and tell him exactly what you told me right now. And if he tell me to give you the phone, I have no problem with that. |
| Coughlin: | We we – and – and you can do that, but we're taking the phone. So it's gone. So your – your decision is either to do a consent to search, where I get that thing up on the box now and I run it, or we seize this phone. I type up an affidavit for a search warrant, take it to the AUSA, get approval, go in front of the judge probably tomorrow, and then I'd search the phone. So the phone's coming with us. So I'm asking you how you wanna do it. How you wanna play it. Because the phone – the phone has |

---

[5] This presumably references Mr. Adams' attorney at the time, whose name was Marco Capone. *Id.* at 4.

|  | evidence on it. You said that these came from – from the brother, or from [S.H.], or looks like you have text messages to and from her. So we need to figure out what's going on. And you're down here trying to clear your name, that's what we're trying to do, too. |
|---|---|
| *** | |
| Dozier: | So that's why we're giving you these options. |
| Coughlin: | Right. That's why we wanna get it now while you're talking to us, we can have it— |
| Dozier: | Yeah. |
| Coughlin: | The information being downloaded. Cause I don't know how long that's gonna take. |
| Dozier: | Right. |
| Coughlin: | But the – the quicker we get this going, the quicker we can get you your phone back. I know people can't live without their phones. |
| Dozier: | Yeah. |
| Adams: | Ehh – eh – uh- what am I gonna say – um . . . in duress, I will give you my phone. |
| Coughlin: | Well no, it's not – it's not duress. |
| Dozier: | It's not – it's not about that. Y— |
| Coughlin: | I mean you can read it. I have been asked by special agents of the FBI to permit a complete search of [my cell phone]. And then I'll write down the information for your phone. I have been advised of my right to refuse consent. I give this permission voluntarily. I authorize these agents to take any items – |
| Adams: | But that's not true. |

*Id.* at 75-77, 82. The discussion continued like this, with agents stressing that Mr. Adams had to choose between consenting to a search or having his phone seized, and with Mr. Adams repeating that agents were "giving [him] no choice," and that his consent was "not voluntary cause I don't really want to." *Id.* at 80, 83.

When Mr. Adams repeated his request to call his attorney, the agents left the room so he could make the call. *Id.* at 84-85. Mr. Adams' attorney called him back approximately 25 minutes later – approximately one hour and 43 minutes after the recorded conversation began. *Id.* at 115. Mr. Adams reported that his lawyer advised him not to consent to a search because the agents could not seize his phone without arresting him or obtaining a warrant. *Id.* Special Agent Coughlin

7

responded, "That's not true . . . it's an exigent circumstance[]," and assured Mr. Adams that they could and would seize his phone if he did not consent. *Id.* Because Mr. Adams did not want to be without his phone, he consented. *Id.* at 115-16. Immediately thereafter, he signed the consent form, stating that he had read the form "three times already," and gave the agents his phone passcode. *Id.* at 116-17. Having listened to the crucial portions of the tape, I find that although Agent Coughlin was assertive at various points, he was not bullying or abusive, and Mr. Adams did not sound intimidated.

## II. Discussion

### A. The agents did not violate Mr. Adams' Fourth Amendment rights when they obtained his voluntary consent to search his cell phone.

Mr. Adams contends that the agents coerced him into giving consent involuntarily when they threatened to seize his phone and hold it until they obtained a search warrant. Def.'s Mem., ECF 95, at 14. I disagree. For the reasons stated below, I conclude that Mr. Adams' consent was voluntary and that the agents' statements about the existence of exigent circumstances and their ability to obtain a warrant were both supported by law and a fair characterization of how the investigation would proceed.

Under the Fourth Amendment, a warrantless search or seizure is lawful when done pursuant to valid, voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government carries the burden of proving by a preponderance of the evidence that a person's consent was the product of an "essentially free and unconstrained choice by its maker." *Id.* at 222, 225; *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989). "There is no talismanic definition of voluntariness, mechanically applicable to the host of situations where the question has arisen." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009) (citing *Schneckloth*, 412 U.S. at 224) (cleaned up). Instead, courts consider the totality of circumstances, with no single factor

or criterion controlling. *Id.* Such factors include: 1) the age, education, and intelligence of the accused, 2) whether the suspect was read his constitutional rights, 3) the length of the police encounter, 4) the repetition or duration of the questioning, and 5) the use of any physical punishment or coercion. *Id.*

If a law enforcement agent makes false statements or misrepresentations to induce consent, even if those falsehoods are innocently made, then an even heavier burden is placed on the government to prove voluntary consent. *See United States v. Molt*, 589 F.2d 1247, 1251-52 (3d Cir. 1978) ("When evidence exists to show [] that a defendant believed he must consent such evidence weighs heavily against a finding that consent was voluntarily given. And when that belief stems directly from misrepresentations by government agents, however innocently we made, we deem the consent even more questionable."); *United States v. Sebitech*, 776 F.2d 412, 424 (3d Cir. 1985) (explaining that a government agent's misrepresentations do not "necessarily vitiate[]" voluntariness, but that the government will carry "an especially heavy burden" to prove consent in such cases). Because the thrust of the defense's argument is that the agents relied on a baseless threat to seize Mr. Adams' phone and obtain a search warrant, I must first determine whether these statements were indeed misrepresentations or if they were supported by law.

Law enforcement can conduct a warrantless seizure of an item like a cell phone only if an exception to the general Fourth Amendment warrant requirement applies. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). One of those exceptions – and the only possible exception in this case – arises when there are exigent circumstances. *Kentucky v. King*, 563 U.S. 452, 460 (2011). Exigent circumstances exist when there is a need "to prevent the imminent destruction of evidence." *Id.* Specifically, law enforcement must have probable cause to believe the item or

9

place to be searched contains evidence of a crime and have good reason to fear that, absent a search or seizure, that evidence will be destroyed. *See McArthur*, 531 U.S. at 331-32.

Here, there were exigent circumstances to justify a warrantless seizure of Mr. Adams' cell phone. First, the FBI agents had probable cause to believe his cell phone contained evidence of a crime. Days before Mr. Adams went to the FBI office voluntarily, agents interviewed J.A. and reviewed three weeks' worth of text messages on her cell phone, all of which explicitly inculpated Mr. Adams in sex trafficking crimes. *See* Coughlin Aff. ¶¶ 6-24. Mr. Adams also confirmed his cell number for the agents, which matched the contact information identified as his in J.A.'s phone. Interview Tr. 2. In addition, Mr. Adams told agents that he communicated with the girls on this phone, that they stayed at his house, and that he knew they were 15 and 16 years old, all while taking them through a lengthy, convoluted story that directly contradicted J.A.'s account and phone records. *Id.* at 39, 41, 46-47, 67-69. Under these unique circumstances, there was enough evidence to cause a person of reasonable caution to believe that Mr. Adams' phone contained evidence of a crime. *See Florida v. Harris*, 568 U.S. 237, 243-44 (2013) (defining probable cause).

Second, the agents had good reason to fear that, absent a seizure, Mr. Adams would destroy any evidence on his cell phone. Both of Mr. Adams' interactions with law enforcement in the days following J.A. and S.H.'s police encounter demonstrated his intentions to deflect suspicion; indeed, despite knowing that he was under investigation, Mr. Adams affirmatively sought out law enforcement twice to discuss his relationship with J.A. and S.H., and both times his account was contradicted by J.A.'s statement and the text messages reviewed from her phone.[6] Moreover, Mr.

---

[6] For example, while Mr. Adams denied having anything to do with posting or sex trafficking, J.A. stated that Mr. Adams directed her to have sex with men for money, kept a portion of the profits, and that she sent him photographs to post on a website called "megapersonals." *See* Voluntary Statement; Interview Tr. 12; Coughlin Aff. ¶¶ 9-11, 13-14. While Mr. Adams stated that he never had sex with J.A., J.A. told agents that she had sex with Mr. Adams so that she could stay in his home. *See* Voluntary Statement; Interview Tr. 106-07; Coughlin Aff. ¶ 9. While Mr. Adams stated that he was not involved in any hotel-based sex

Adams showed agents printed-out screenshots of text messages between the J.A. and S.H. to exculpate himself from any hotel-related activity, but did not want to divulge his own communications with the girls.  *See* Interview Tr. 72-75.  Mr. Adams' affirmative attempts to divert suspicion from himself provided fertile ground for agents to believe that he would continue to obstruct their investigation by destroying any evidence that may have existed on his phone.  These circumstances created an exigency that supported a warrantless seizure of Mr. Adams' phone, confirming that the agents did not rely on misrepresentations to induce Mr. Adams' consent.

For similar reasons, the agents did not mislead Mr. Adams when they stated that they could obtain a search warrant for his cell phone.  The agents had interviewed J.A. and reviewed the contents of her phone, and they confirmed that Mr. Adams' phone number matched the contact information in J.A.'s phone.  The texts between Mr. Adams and J.A., some of which are included above, describe their agreement to facilitate sex work for J.A., and some texts even contemporaneously document that sex work.  With J.A.'s interview and her text messages at their disposal, the agents undoubtedly had enough probable cause to obtain a warrant.[7]

---

work activity, J.A. said that she had sex in exchange for money at Mr. Adams' direction at the Microtel hotel.  *See* Interview Tr. 69-74; Coughlin Aff. ¶ 24.  On even far less significant details, Mr. Adams provided accounts inconsistent with J.A.'s interview, including about how long J.A. stayed with him at Mentor Street and why he eventually made her leave.  *See* Interview Tr. 46-48; Coughlin Aff. ¶¶ 10, 14.

[7] Mr. Adams also argues that, even if the agents did have probable cause to obtain a warrant, they would not have had the authority to compel Mr. Adams to unlock his phone with a passcode.  Def.'s Mem. at 15-17.  But the current case does not require me to grapple with such potential Fifth Amendment issues because the agents here did not represent to Mr. Adams that he would be compelled to provide his passcode, so they did not mislead him.  Federal law enforcement can employ other means to search a phone, such as mobile device forensic tools (MDFTs) through companies like Cellebrite.  *See, e.g.*, *United States v. Bacon*, No. 18-75, 2021 WL 5051364, at *5 (D. Del. Nov. 1, 2021) (Stark, J.) (explaining how law enforcement seized a cell phone, obtained a search warrant, and then sent the phone to Cellebrite, which used its own technology to obtain the phone's passcode); *United States v. Malave*, No. 19-218-2, 2022 WL 824009, at *3 (E.D. Pa. Mar. 18, 2022) (Smith, J.) (stating that, after law enforcement obtained a search warrant, "officers extracted and downloaded the contents and data of the LG cellphone using Cellebrite software"); *United States v.*

In sum, the agents' threats to seize Mr. Adams' phone and obtain a warrant were not "baseless." *Cf. United States v. Hicks*, 539 F.3d 566, 571 (7th Cir. 2008) (finding that "baseless" threats to obtain a search warrant weigh heavily in favor of involuntary consent). Instead, the agents fairly explained how they would proceed if Mr. Adams refused consent, which does not undermine voluntariness.[8] *See, e.g., United States v. Bertrand*, No. 19-525, 2022 WL 2718525, at *2 (E.D. Pa. July 13, 2022) (Bartle, J.) (concluding that defendant's consent was voluntary in a similar case because "[t]he fact that defendant was anxious for the return of his cellphone which he needed for his business" does not undermine voluntariness); *United States v. Nickas*, No. 21-143, 2022 WL 2834680, at *7-8 (M.D. Pa. July 20, 2022) (finding consent voluntary even though officers told defendant they would seek a search warrant for her cell phone if she didn't consent to a search); *United States v. Faruolo*, 506 F.2d 490, 493-94 (2d Cir. 1974) (holding that officers' stated intention to obtain a warrant in the absence of consent did not undermine voluntariness because there was "no deceit or trickery" involved); *United States v. Lee*, 317 F.3d 26, 33 (1st Cir. 2003) ("[T]he appellant points principally to the fact that the police informed him that, if he did not consent to a search of the van, they would simply secure a warrant. Courts have held, with a regularity bordering on the monotonous, that this sort of statement, made in a case in which the facts were sufficient to support the issuance of a search warrant, does not constitute coercion.");

---

*Cook*, No. 16-312, 2021 WL 1534980, at *4 (M.D. Pa. Apr. 19, 2021) (explaining that Cellebrite "released a software update that included a lock bypass" for Defendant's cell phone).

[8] It bears noting that, in *Sebetich*, the Third Circuit warned that if an officer leads a suspect to believe that obtaining a warrant is a "forgone conclusion," then it will be more difficult for the government to meet their burden of showing voluntariness. 776 F.2d at 425. Instead, officers should assert that, in the absence of consent, they will *seek* a warrant which will only be granted if a judge finds there to be probable cause. *Id.* Here, the officers do seem to present the granting of a warrant to search as a forgone conclusion. *See* Interview Tr. 76 ("We have to write up – type up a search warrant. Go get it to the AUSA to get approval, go in front of a judge to get it sworn out, and then we can search the phone."). Although this is ill-advised, because there was significant evidence to support a finding of probable cause in this particular circumstance, I do not find the agent's statements misleading.

12

*United States v. Compton*, 704 F.2d 739, 742 (5th Cir. 1983) (concluding that consent was valid even though agents threatened to obtain a warrant and search defendant's car in the absence of consent).

A review of the remaining *Schneckloth* factors also weigh in favor of voluntary consent. Mr. Adams' age, education, and intelligence support voluntariness, as he was 42 years old, attended real estate school, and held several jobs. Interview Tr. 8, 11, 13. At hearings he has shown a keen intellect and filed *pro se* documents with a great degree of sophistication. Mr. Adams was informed of the right to refuse consent, signed a written consent form, and even had the opportunity to speak with his attorney before signing.[9] *See Price,* 558 F.3d at 279 (quoting *Schneckloth*, 412 U.S. at 227) ("[W]hile knowledge of the right to refuse consent is one factor to be taken into account, the [G]overnment need not establish such knowledge as the *sine qua non* of an effective consent."); *Velasquez*, 885 F.2d at 1082 (finding consent voluntary under the circumstances, including that defendant was provided and signed a written consent form). The agents did not use or threaten physical coercion, and the setting itself was not coercive in nature. Although Mr. Adams spoke with agents at the FBI office in a private room, he did so at his own behest, he was in the presence of just two officers, and he was never placed under arrest or told he was not free to leave. *See Price*, 558 F.3d at 279 (finding consent voluntary when the suspect was not "overwhelm[ed]" by a large number of officers and when she was not "arrested, handcuffed, or even touched"); *United States v. Baer*, No. 15-417, 2016 WL 4718214, at *7 (D.N.J. Sept. 9, 2016) (finding valid consent where no force or threat of force was used, and where defendant was never under arrest, in custody, or handcuffed); *United States v. Chan-Guillen*, No. 20-689, 2022

---

[9] Mr. Adams was not read *Miranda* rights because he was not in custody, as explained below.

WL 986272, at *6 (D.N.J. Apr. 1, 2022) (finding consent voluntary when defendant signed a consent form while he was in custody and sitting in a police station interview room).

Finally, the 90-minute conversation leading up to Mr. Adams' consent was not a long enough period to undermine voluntariness and, even if the questioning was prolonged or repetitive, that factor alone would not be enough to render Mr. Adams' consent involuntary. *See United States v. Sturgis*, No. 2-34, 2003 WL 1746244, at *7 (D. Del. Mar. 31, 2003) (finding four interviews in seven months, one which lasted two hours and several which were initiated by defendant, were not so prolonged as to weigh against voluntary consent); *United States v. Santiago*, No. 5-32-3, 2008 WL 2929027, at *3 (E.D. Pa. July 30, 2008) (Sanchez, J.) (finding statements voluntary when a suspect "evade[d] such a confession for ninety minutes"). Indeed, the entire conversation was cordial, with Mr. Adams leading the agents through his complicated story and, at times, even making jokes along the way. *See United States v. Williams*, 898 F.3d 323, 332 (3d Cir. 2018) (finding consent voluntary when the interaction was "not hostile"). Under the totality of circumstances in this case, and especially because Mr. Adams initiated this interaction to divert suspicion from himself, I conclude that his consent was voluntary.[10]

---

[10] Mr. Adams' remaining arguments lack merit. Mr. Adams argued that agents ignored his requests to speak with his attorney and that he was confused about his rights. As will be discussed below, Mr. Adams was not subject to custodial interrogation, so the agents were not required to read him his *Miranda* rights or to cease all questioning when Mr. Adams said he wished to speak to his attorney. Moreover, before Mr. Adams signed the consent form, he did have the opportunity to speak with his attorney. Mr. Adams also argued that he felt like he was under duress because he did not feel free to leave the FBI office without his cell phone. Although this may present a difficult choice to a suspect, the circumstances do not rise to the level of duress. *See Bertrand*, 2022 WL 2718525, at *2 (explaining that the threat of being without one's phone does not undermine voluntariness); *see also United States v. Santos*, 932 F.2d 244, 249 (3d Cir. 1991) (defining duress in a criminal case as acting under the threat of immediate death or serious bodily injury without reasonable opportunity to escape). Finally, Defendant's argument that the agents failed to summarize the meaning of the consent form is unpersuasive, as the agents read the form aloud and offered to read it again before Mr. Adams signed it.

Lastly, the government argues that, even if Mr. Adams did not voluntarily consent, the contents of the search should still not be suppressed because of the inevitable discovery doctrine. Mr. Adams, alternatively, argues the doctrine does not apply. Because I have decided this Motion on the grounds of voluntary consent, I do not reach the inevitable discovery question.

### B. The agents did not violate Mr. Adams' Fifth Amendment rights.

Mr. Adams also argues that the agents violated his Fifth Amendment rights in two ways: 1) he was involuntarily compelled to provide testimony against himself in the form of his cell phone passcode and 2) the agents did not cease questioning him when he asked to contact his attorney, as required by *Edwards v. Arizona*, 451 U.S. 477 (1981). Def.'s Mem. at 23. Because I have already found Mr. Adams' consent voluntary, and because the same voluntariness standard applies in the context of both the Fourth and Fifth Amendments, I will only address the second issue. *See Schneckloth*, 412 U.S. at 229 ("Just as was true with confessions, the requirement of a voluntary consent reflects a fair accommodation of the constitutional requirements involved . . . In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of voluntariness.") (cleaned up). As to Defendant's argument about his invocation of right to counsel, I conclude that the agents did not violate Mr. Adams' Fifth Amendment rights because he was not in custody.

Before beginning an interrogation, law enforcement must warn suspects in custody of certain fundamental rights. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). These warnings "dispel the compulsion inherent in custodial surroundings," and therefore apply only when a suspect is in custody. *Id.* at 458. Likewise, only individuals in custody are entitled to have all questioning cease when they invoke their right to counsel. *See Edwards*, 451 U.S. at 485.

15

An individual is in custody when he or she feels, as an objective matter, "not at liberty to terminate the interrogation and leave." *Yarbough v. Alvarado*, 541 U.S. 652, 663 (2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)); *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019). Courts consider several factors in defining custody, including: "the interview's location, physical surroundings, and duration; whether [the suspect] voluntarily participated; whether he was physically restrained; whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; and whether the interviewee was released when the questioning was over." *Ludwikowski*, 944 F.3d at 132; *see United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). In addition, courts consider "whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; and whether he agreed to meet knowing that he would be questioned about a criminal offense," as well as whether "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Ludwikowski*, 944 F.3d at 132 (citations omitted).

Here, Mr. Adams was not in custody. Although the interaction took place in the FBI office, that location was chosen by Mr. Adams who arrived there unsolicited. *See id.* at 132-33 (finding that the police station location did not weigh toward custody when defendant "arranged to go to the station voluntarily" and had time to think about the encounter beforehand). Not only did Mr. Adams travel to the FBI office without being asked, but he also specifically stated his preference to discuss the investigation at the FBI office and not at his home. Interview Tr. 3-4. Further, although the conversation was lengthy, it was shorter than the interview in *Ludwikowski*, which included four hours of active questioning and seven hours of time spent at the station, where the defendant was also not in custody. 944 F.3d at 133. Thus, the first two factors – the location and

duration of the questioning and whether defendant voluntarily participated – weigh against a finding of custody.

Moreover, Mr. Adams was never physically restrained, and he left the office without incident. The agents employed no additional coercive tactics – they used no hostile tones and no weapons were displayed. *See id.* at 132; *United States v. Morgan*, No. 12-23, 2012 WL 5494668, at *7 (E.D. Pa. Nov. 13, 2012) (Slomsky, J.) (explaining that defendant was not in custody in part because he volunteered to speak with police, he was not under arrest, and officers didn't use hostile voices or restraints). And, although the agents did tell Mr. Adams that he would not be able to leave with his cell phone immediately, they never insinuated that he was not free to leave *without* it. While Mr. Adams did not want to leave his phone behind, such circumstances do not create compulsion akin to that at issue in *Miranda*. *See also Bertrand*, 2022 WL 2718525, at *2 ("[t]he fact that defendant was anxious for the return of his cellphone which he needed for his business" did not undermine voluntariness). Finally, though agents did believe Mr. Adams was involved in a crime, that factor is well outweighed by the other factors, especially because the agents engaged with him only after he voluntarily initiated the conversation. *Ludwikowski*, 944 F.3d at 132-33.

Because the factors laid out in *Ludwikowski* demonstrate that Mr. Adams was not in custody, his Fifth Amendment rights were not violated.

**III.    Conclusion**

For the reasons set forth above, Defendant's Motion to Suppress will be denied. An appropriate order follows.

/s/ Gerald Austin McHugh\_\_\_\_
United States District Judge